UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

United States of America,                    Criminal No. 1:18-cr-20505

    Plaintiff,                                   Honorable Thomas Ludington

v.

Michael Brown

    Defendant.

_____/

## United States' Response Opposing the Defendant's Motion for Compassionate Release

Michael Brown is currently serving a 60-month custodial sentence for possession with intent to deliver crack cocaine in violation of 21 U.S.C. 841(a)(1) & (b)(1)(B). According to the BOP website, his earliest projected release date is October 21, 2021.

Brown does not qualify for compassionate release. He does not satisfy substantive requirements for compassionate release. "[T]he mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate

1

release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). Brown

does not have a condition that places him at higher risk from Covid-19.

Further, Brown's criminal history make him a danger to the

community, precluding release under USSG § 1B1.13 (2). Brown has

six previous theft related convictions including theft, robbery and

finally armed robbery. He further has a forty-year history of drug

abuse and three previous convictions for manufacture/distribution of a

controlled substance. The defendant was off of parole for less than

three years when he was arrested for the instant offense of possession

with intent to distribute crack cocaine.

The Bureau of Prisons has also taken significant steps to protect all

inmates, including Brown, from Covid-19. Since January 2020, the

Bureau of Prisons has implemented "a phased approach nationwide,"

implementing an increasingly strict protocol to minimize the virus's

spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th

Cir. 2020). And the Bureau of Prisons has assessed its entire population

to determine which inmates face the most risk from Covid-19, pose the

least danger to public safety, and can safely be granted home

confinement. As of August 25, 2020, this process has already resulted in

2

at least 7,578 inmates being placed on home confinement. *See* BOP Covid-19 Website. At least 120 of those inmates are from the Eastern District of Michigan. Given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Brown's motion for compassionate release.

## Background

Defendant has nine previous felony convictions stretching back to his early twenties.  He has a forty-year history of addiction and drug abuse. He was previously convicted of armed robbery of a convenience store and after that committed the offense for which he is now incarcerated. The instant offense involved the following facts taken from Brown's (PSR – Paras. 11-12).

Prior to June 22, 2018, officers from the Violent, Incident, Prevention, Enforcement Response (VIPER) Unit in Bay City, Michigan, conducted a controlled purchase of crack cocaine from Michael Brown with the use of a Confidential Informant (CI). Officers were able to secure a search warrant for the defendant's residence. On June 22, 2018, officers executed a search warrant at the defendant's

residence in Bay City, Michigan. Officers searched the residence and located a digital scale with cocaine residue; a glass crack pipe; 79 grams of crack cocaine divided up between three plastic bags; 22 grams of powder cocaine; a plastic container with crack cocaine and a razor blade inside; a plate with crack cocaine and a razor blade in the oven; approximately $920.00 in cash; the defendant's driver's license; used rubber gloves; and small zip lock plastic bags.

Brown began serving his prison sentence on June 3, 2019, and is currently incarcerated at Milan Correctional Facility.  He is 53 years old, and his projected release date is October 21, 2021.  His only underlying medical condition is high blood pressure, which is controlled by medication.  It should be noted he is 5'4" and weighs approximately 160 pounds.  His BMI is 27.  His doctor has diagnosed him as pre-diabetic, but the doctor's recommendation is a better diet and exercise as noted in Brown's medical history.  Nevertheless, Brown has moved for compassionate release, citing his medical conditions and the Covid-19 pandemic. He has exhausted his relief and the bureau of prisons has denied his request for compassionate relief.

**Argument**

**I.    The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

> **A.    The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread of the disease, the Bureau of Prisons has restricted inmate movement within and between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed in quarantine for a minimum of 14 days. *Id.* Symptomatic

5

inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* [BOP FAQs: Correcting Myths and Misinformation](#). Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19

completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B.   The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in

deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 7,500 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their

8

criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would

adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

10

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.    The Court should deny Brown's motion for compassionate release.

Brown's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are

11

narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001).
Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally
narrow.

*First*, compassionate release requires exhaustion. If a defendant
moves for compassionate release, the district court may not act on the
motion unless the defendant files it "after" either completing the
administrative process within the Bureau of Prisons or waiting 30 days
from when the warden at his facility received his request. 18 U.S.C.
§ 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832 (6th Cir.
2020). And as the Sixth Circuit recently held, this statutory exhaustion
requirement is mandatory. *Alam*, 960 F.3d at 832–36.

*Second*, even if a defendant exhausts, he must show "extraordinary
and compelling reasons" for compassionate release, and release must be
"consistent with" the Sentencing Commission's policy statements. 18
U.S.C. § 3582(c)(1)(A). As with the identical language in § 3582(c)(2),
compliance with the policy statements incorporated by § 3582(c)(1)(A) is
mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United
States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a
defendant must have a medical condition, age-related issue, family

circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2).

*Third*, even if a defendant is eligible for compassionate release, a district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a).

### C. Brown is not eligible for compassionate release under the Mandatory criteria in USSG § 1B1.13

Even though Brown has exhausted his administrative remedies, his compassionate release would still be improper.  Congress tasked the Sentencing Commission with "describ[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t). The compassionate-release statute thus permits a sentence

reduction only when "consistent with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG § 1B1.13, compliance with that policy statement is mandatory for any defendant seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

14

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding.

Section 1B1.13 narrowly tailors compassionate release to a group of non-dangerous defendants, who are most in need.  That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Brown and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify

compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Brown's age and medical condition likewise do not satisfy the requirements for release in USSG § 1B1.13 cmt. n.1, even when considered in combination with the Covid-19 pandemic. Brown is 54 and suffers from high blood pressure which is controlled by medication. His medical records establish that he does not have a condition that is known to place him at a higher risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated) (identifying the confirmed medical conditions that increase someone's risk from Covid-19). While hypertension may be a risk factor for severe illness from Covid-19, the CDC has determined that there is insufficient data to establish that such individuals actually are at increased risk. (*Id.*). Moreover, here, Brown's hypertension appears to be controlled with medication that he is receiving while in BOP custody. Brown also claims that he is at higher risk from Covid-19 due to having been exposed to hepatitis C and tuberculosis. However, Brown's medical records show that he has tested negative for both diseases. [Cite to medical records.] So whether

considered alone or in combination with the Covid-19 pandemic,
Brown's age and medical condition do not satisfy the initial eligibility
criteria for release under USSG § 1B1.13 cmt. n.1. *See United States v.
Murphy*, No. 15-20411, 2020 WL 2507619, at *5–*6 (E.D. Mich. May 15,
2020).

Further, Brown's significant criminal record casts doubt on whether
he would abide by the release conditions and social-distancing protocols
that could diminish his risk of contracting Covid-19 if released from
custody. Although the *average* person might have a higher risk of
contracting or developing complications from Covid-19 in prison than if
released, an *individual* defendant's risk varies widely. It depends on a
long list of variables, including the precautions at his prison, the
number of Covid-19 cases there, the prison's medical facilities, his
access to medical care if released, and the threat from Covid-19 at his
release location. A defendant's risk of contracting Covid-19 also depends
not just on his opportunities for social-distancing, but on his willingness
to take advantage of those opportunities and engage in social-distancing
for the pandemic's duration.  Brown has not had a stable family life for
many years and has never held a stable job.  He therefore may be at

17

higher risk of contracting Covid-19 as he does not have access to stable housing and certainly is not able to work from home. (PSR - Paragraphs 53-56).

Brown also remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a

19

danger to the community."); *Knight*, 2020 WL 3055987, at \*3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at \*3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect. *See Stone*, 608 F.3d at 948 n.7; *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm."); *United States v. Israel*, No. 17-20366, 2017 WL 3084374, at \*5 (E.D. Mich. July 20, 2017) (recognizing that "economic harm may qualify as a danger" foreclosing release).

Adhering to § 1B1.13 (2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-

20

19-based fraud schemes have proliferated. Drug overdoses are

skyrocketing. There are real risks to public safety right now, and those

risks will only increase if our community is faced with a sudden influx

of convicted defendants.

Because Brown's release would endanger the community, § 1B1.13(2)

prohibits reducing his sentence under § 3582(c)(1)(A). Brown is a

convicted drug dealer with six previous theft related convictions

including theft, robbery and finally armed robbery, and a history of

addiction.  He would be a danger to the community under any

circumstances.

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling

reasons" and demonstrated that he is not dangerous, he is still not

entitled to compassionate release. Before ordering relief, the Court must

consider the factors set forth in 18 U.S.C. § 3553(a) and determine that

release is appropriate. *See United States v. Knight*, No. 15-20283, 2020

WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . .

weigh against his request for compassionate release."); *United States v.*

*Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15,

21

2020) (holding that the "[d]efendant's circumstances do not warrant compassionate release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at \*6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Brown eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Brown began serving his sentence on June 3, 2019 and was sentenced to 60 months. He has currently served 14 months of a 60 month sentence. That is less than 25% of his current sentence. While it is true that his earliest possible release date is October of 2021; there is no guarantee he will be released at the earliest possible date. Assuming that he is released in October of 2021; that would make his actual time served 32 months. At this point he has still served less than half his sentence even with a projected release date of October of 2021, as he would have served only 14 months. A district court may deny compassionate release when defendant has "served only a fraction of his

sentence."  United States v. Kincaid, 805 F.App'x 394, 396 (6th Cir. May 18, 2020).

Granting Brown compassionate release when he has served less than a quarter of his original sentence would lead to an unwarranted sentencing disparity, and improperly minimize the seriousness of his drug offense and undermine the deterrent effect of his sentence.  For these reasons the factors in U.S.C. § 3553(a) weigh against compassionate release for Brown.

## II.    If the Court were to grant Brown's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Brown's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Brown's motion should be denied.


                                          MATTHEW SCHNEIDER
                                          United States Attorney

Dated: August 27, 2020

                                          s/ALISON FURTAW
                                          ALISON FURTAW, P55893
                                          Assistant United States Attorney
                                          600 Church Street, Flint, MI 48502
                                          Telephone: 810.766.5177

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2020, the foregoing document was electronically filed by an employee of the United States Attorney's Office with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

**Benjamin Glassman**

<u>s/JESSICA SZUKHENT</u>
United States Attorney's Office
Legal Assistant